IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KIMBERLY K. REDWINE                     )
                                        )          8:10CV286
                    Plaintiff,          )
       v.                               )
                                        )     MEMORANDUM AND ORDER
MICHAEL J. ASTRUE, Commissioner         )
of Social Security Administration,      )
                                        )
                    Defendant.          )
                                        )
_____     )


       This matter is before the court on the plaintiff's appeal from the Social Security

Administration's denial of her request for disability benefits.  Filing No. 1.  This is an action

for judicial review of a final decision of the Commissioner of the Social Security

Administration ("the Commissioner").  The plaintiff appeals the Commissioner's decision

to deny her applications for disability benefits under Title II of the Social Security Act ("the

Act"), 42 U.S.C. § 401 et seq., and Supplemental Security Income ("SSI") benefits under

Title XVI of the Act, 42 U.S.C. § 1381.  This court has jurisdiction under 42 U.S.C. §§

405(g) and 1383(c)(3).

       On January 7, 2009, the plaintiff, Kimberly K. Redwine, filed for Social Security

disability benefits, alleging an onset of disability beginning April 8, 2007.  Filing No. 14,

Administrative Record ("Admin. R.") at 10.[1]  At the administrative hearing, the plaintiff

amended her alleged onset date to August 30, 2007.[2]  Id. at 29.  Her application was

_____

       [1]References to page numbers are to the numbers at the bottom right hand corner of each page of the
electronically-filed administrative record.  These numbers correspond to the page numbers of the PDF
document.

       [2]Redwine previously filed an application for a period of disability and disability insurance benefits, on
January 25, 2002, alleging inability to work beginning November 15, 2001.  The claim was denied initially, on
April 10, 2002, and the claimant did not file a request for reconsideration. The claimant also filed an application

denied initially and on reconsideration.  *Id.* at 69-72, 75-78.  She requested a hearing and appeared at a video hearing before an administrative law judge ("ALJ") on June 3, 2009.  *Id.* at 29-60.  Thereafter, the ALJ denied benefits finding Redwine was not disabled within the meaning of Social Security regulations.  *Id.* at 11.  On May 28, 2010, the Appeals Council denied Redwine's request for review of the ALJ's decision, which made the ALJ's decision the final decision of the Commissioner.  *Id.* at 1-3.

## I.  BACKGROUND

### A.  Facts

At the hearing, Kimberly Redwine, a woman in her mid-40s, testified that she was then living with her 17-year-old and 14-year-old daughters, and has two other adult children who do not live with her.  *Id.* at 33. She weighs 140 pounds and is 5 feet 8 inches tall.  *Id.* at 33.  The record shows that she completed four years of college and she is a registered nurse.  *Id.* at 458.  She testified that she has not worked since August of 2007.  *Id.* at 34.

In answer to pain and activity questionnaires from the Social Security Administration, Redwine described her symptoms as follows: mental fatigue, decreased mental concentration, blurred vision, lightheaded, dry mouth, facial flushing, muscle weakness, shortness of breath, chest pain, increased heart rate, irregular heart rhythm, abdominal pain, bladder pain, urinary frequency, pelvic pressure, right leg discomfort, insomnia, right lower back pain.  *Id.* at 231.  She stated she experienced symptoms numerous times throughout each day.  *Id.*  She also reported that medication did not alleviate all of her

---

for a period of disability and disability insurance benefits, on January 18, 2005, alleging disability beginning November 15, 2001. The claim was denied initially, on June 21, 2005, on reconsideration, on September 30, 2005, and by the same Administrative Law Judge involved in this case on August 29, 2007.  *See* Filing No. 14, Admin. R. at 10 (ALJ decision).  Accordingly, Ms. Redwine amended her alleged onset of disability to August 30, 2007.

symptoms.  *Id.*  She further reported her ability to concentrate had decreased and she had blurred vision and occasional incontinence.  *Id.* at 234–35.  Her symptoms were exacerbated by activity, eating, or fluctuations in temperature.  *Id.* at 237-38.

At the hearing, Ms. Redwine testified she was taking six prescription medications.[3] *Id.* at 34.  In addition, she testified that she was seeing a counselor on a regular basis and that she traveled to the Mayo Clinic to see a psychiatrist.  *Id.* at 35.  Redwine also testified that she had experienced considerable problems with weight loss over the past two years. *Id.* at 33.  She testified that she also experiences eye twitching, dry mouth and flushing. *Id.* at 36.  She also testified she is affected by extreme heat or cold, and the humidity in the air affects her circulatory system and her "heart rate."  *Id.*  In addition, loud noise or vibration makes Redwine mentally fatigued.  *Id.*

Redwine testified that she owns a motor vehicle and that she operates it "most every day."  *Id.* at 37.  The longest distance she has driven is approximately 300 miles, with her daughter assisting.  *Id.*  She would drive a total of three hours during a trip of that length. *Id.* at 49.  She stated that her daily activities typically include waking up around 9:00 to 9:30 a.m., preparing breakfast, taking her medications, letting her dogs outside and feeding them, listening to music, making herself lunch, taking care of her daughters when ill, going to her daughter's activities, performing  chores such as loading the dishwasher or doing laundry in 15-minute increments.  *Id.* at  38-39.  She testified that she naps for at least an

---

[3] Redwine's medications are Midodrine, 5 mg. three times per day for low blood pressure; Pyridostigmine, 60 mg. two times per day and 30 mg. once a day for her autonomic nervous system; Ditropan XL, 15 mg. per day  for bladder disease; Remeron, 60 mg. per day for depression and Ambien CR, 12.5 mg. per day  for insomnia.  *Id.* at 34-35, 333.  The record also shows that she has been prescribed numerous other medications at various times.  *Id.* at 204, 232, 252, 268, 278, 290, 291, 309.

3

hour or two every day.  *Id.* at 37-39.  Sometimes she lies down and rests in the early evening as well.  *Id.* at 45.  She stated she spends two to three hours lying down every day, at a minimum.  *Id.* at 46.  She stated that she tries to get ten hours of sleep each night and if she does not, she will not "feel well enough to really function much throughout the day."  *Id.* at 40.  On weekends she attends church and 75 percent of her daughter's activities.  *Id.*  She testified that after attending an activity such as a basketball game or a track meet, she is "extremely fatigued."  *Id.* at 40, 46.  Her other activities include attending Bible study once a week and an Al-Anon meeting once or twice a week.  *Id.* at 42.

She also stated that after attending a sporting event or walking six blocks she generally feels dizzy, lightheaded, and extremely fatigued and has to lie down.  *Id.* at 15, 46-47.  Further, she testified her mind gets "real foggy," her vision blurs, she experiences chest pain, and feels a burning in her bladder that can last for hours after the activity.  *Id.* at 46-47.  She stated she also has chest pain as well as bladder pain on daily basis.  *Id.* at 47.  She stated she has a "very strong burning pain in my bladder several hours every day" and experiences chest pain three to four times a day.  *Id.* at 47.

Redwine also testified it is difficult for her shop and to "walk through a store and push a grocery cart full of food, because it taxes my, my heart and my blood pressure."  *Id.* at 41.  On a "good day," she can walk about six blocks, but on a "bad day" she usually stays in the house and walks around the house doing her chores.  *Id.* at 41-42.  She stated she lies down more on a bad day than on a good day.  *Id.*  She testified she has "good days" about 60 percent of the time and "bad days" about 40 percent of the time.  *Id.*  She also stated that when she is fatigued, she has difficulty with her balance.  *Id.* at 44.

Redwine testified that she can remain seated for about 60 minutes at a time and can be on her feet for about 30 minutes at a time, if she can move around. *Id.* She predicts that she can safely lift 25 pounds, but gets lightheaded when she carries things. *Id.* at 15, 43. She also testified that she can walk up and down stairs, stoop or bend down, reach for items on the table or in overhead kitchen cabinets. *Id.* However, she stated that her eyesight fluctuates because of low blood pressure and she has blurred vision several times a day that often "limit[s] what [she's] doing." *Id.* at 44-45. In addition, digesting food causes fatigue. *Id.* Overall, she describes her energy level as "low." *Id.* at 45. She was asked if she could physically handle an indoor, sit-down job if she did not have to lift more than 10 pounds, could sit for six hours and could get up and move around, given her exertional capabilities. *Id.* at 49-50. She responded, "I believe that my fatigue level would be—effect that, especially my mental fatigue, as well as my, my vision fluctuating so much during the day. I also—I, I would have to lay down also throughout that time period." *Id.* at 50.

Dr. Nancy Winfrey, a clinical psychologist, testified as a medical expert at the hearing. *Id.* at 30-33. She testified that she had reviewed the medical evidence and found that although Redwine had earlier been diagnosed with dysthymia,[4] the records indicated that she had only mild difficulties with activities of daily living and social functioning, mild difficulties with concentration, persistence and pace and no episodes of decompensation. *Id.* at 31-32.

---

[4]Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Stedman's Medical Dictionary (27th ed. 2000), *available at* STEDMANS 122470 (Westlaw) (hereinafter, "STEDMANS").

A vocational expert, Dr. William Tysdal, also testified at the hearing. *Id.* at 50.  He testified that Redwine could not perform any of her past relevant work as a nurse, which would be characterized as work requiring a medium level of exertion. *Id.* at 52.   He was asked whether a claimant with disabilities similar to Redwine's could perform work in the national or regional economy.[5] *Id.*  Dr. Tysdal responded that "the claimant has skills that would transfer to sedentary occupation as well as there would be unskilled, sedentary work that individual could perform." *Id.* at 52-53.  The vocational expert stated the skills that transfer are in the healthcare and medical services field and nursing field. *Id.* at 53. Examples of skilled jobs that require transferable skills from the healthcare, medical services and nursing field are an "assistant," and a cardiac monitor technician. *Id.*  He further testified that there were many such jobs in the national and regional economy. *Id.* 53.  He also testified that the hypothetical person could perform unskilled, sedentary-level work such as that of an "account clerk" and that there were many of those jobs as well. *Id.* The vocational expert was asked also what jobs would be available for a hypothetical worker with lifting and carrying limitations at the light, rather than the sedentary, exertional

---

[5]Specifically, he was asked to assume a hypothetical worker of the claimant's age, education, and past work experience with the following limitations:

> In terms of lifting and carrying this worker would be limited to sedentary level as we use that term in the regulations (INAUDIBLE) familiar with in your profession. Standing and/or walking would be about four hours in an eight-hour work day with normal breaks, but it should not be done more than a half hour or three quarters of an hour at a time. Sitting would be at least six hours in an eight-hour work day with normal breaks.  Pushing and pulling would be the same level as carrying.  And only frequently have to go up or down stairs or steps—well make that occasionally, occasionally go up or down, stairs and steps.  And never ladders, ropes, scaffolds, things like that.  Only occasionally balance, stoop, kneel, crouch, or crawl. And they would need to work where they're not subjected to concentrated exposure with extreme heat or extreme cold, humidity, noise, or hazards in the work place. . . .

*Id.* at 52.

level.  *Id.* at 53-54.  The vocational expert added the position of "office helper," which is unskilled, to the list of jobs that the hypothetical person could perform.  *Id.* at 54.

The vocational expert also testified that if the hypothetical person needed to lie down during the day "more than what would be allowed during normal breaks, that being 15 minutes in the morning, 15 minutes in the afternoon, and 30 to 60 minutes for lunch," he believed "that individual could not be competitively employed."  *Id.* at 55.  Further, he stated that an unskilled worker who had to miss two days per month or a skilled worker who had to miss two to three days per month could not sustain employment.  *Id.*

Shortly before the hearing, plaintiff's counsel submitted the plaintiff's updated medical records form Scottsbluff Urology Associates.  *Id.* at 139.  The medical evidence shows that Redwine has been diagnosed at various times with paroxysms of atrial fibrillation,[6] interstitial cystitis,[7] depression, cardiac arrhythmia, chronic fatigue syndrome,[8] orthostatic intolerance,[9] autonomic neuropathy, unexplained weight loss, possible POTS

---

[6]Atrial fibrillation is "fibrillation in which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall; the ventricles respond irregularly to the dysrhythmic bombardment from the atria."  STEDMANS 148120.  A paroxysm is a sudden attack or, a sudden recurrence or attack of a disease; a sudden worsening of symptoms.  *See* Oxford English Dictionary (3d ed. 2005) *available at* <http://www.oed.com/view/Entry/138111>; last accessed March 19, 2012.  Paroxysmal means "relating to or occurring in paroxysms."  STEDMANS 299890.

[7]Interstitial cystitis is "a chronic inflammatory condition of unknown etiology involving the epithelium and muscularis of the bladder, resulting in reduced bladder capacity, pain relieved by voiding, and severe bladder irritative symptoms."  STEDMANS  99660.

[8]Chronic Fatigue Syndrome (CFS) is "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity . . . characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities."  Soc. Sec. Rul. 99-2p, 1999 WL 271569, at *1 (April 30, 1999) (Policy Interpretation Titles II and XVI: Evaluating Cases Involving Chronic Fatigue Syndrome (CFS)).

[9]Orthostatic means "[r]elating to an erect posture or position."  Orthostatic intolerance "refers to a set of symptoms that develops when patients stand up that disappears when they sit back down.  And typically these are symptoms of lightheadedness, palpitations, weakness, and a feeling that they would faint if they did not sit back down"  *See* Filing No. 14, Admin. R. at 295 (Deposition of Phillip Low, M.D.).

[Postural Orthostatic Tachycardia Syndrome],[10] and bladder ulceration. *Id.* at 60, 285, 266, 271, 284-85, 307, 326-28, 311, 287, 289, 330, 390, 446, 449.

The medical evidence also shows that Redwine has a history of severe supraventricular tachyarrhythmias, paroxysmal atrial fibrillation, and palpitations. *Id*. at 383, 386, 393. In 2003, she was noted as having "debilitating atrial fibrillation." *Id.* at 376. She has suffered from general weakness and fatigue, suspected orthostatic hypotension[11] and autonomic dysfunction. *Id.* at 451. She has undergone two cardiac procedures:  an S/P radiofrequency ablation for atrial fibrillation in 2004 and an S/P radiofrequency ablation[12] of slow pathway in 2005. *Id.* at 450-51. She continued to report palpitations after the cardiac procedures were performed. *Id.* at 394.

Redwine was treated at Mayo Clinic in July and August 2007. *Id.* at 419-464. Her treating neurologist's notes indicate that "since the beginning of 2007, although she continues to have occasional breakthroughs of transient atrial fibrillation and other tachyarrhythmias, her symptoms have been dominated by severe fatigue." *Id.* at 453. She reported her symptoms were dramatically worse following a meal. *Id.* She was seen by a cardiologist, a psychiatrist, a neurologist, a dermatologist, and a urologist at Mayo Clinic. *Id.* at 448, 451, 456, 460. She underwent numerous procedures and tests, including a lip

---

[10] Orthostatic tachycardia is increased heart rate on assuming the erect posture. STEDMANS 398860.

[11]Orthostatic hypotension is a form of low blood pressure that occurs in a standing posture. STEDMANS 196480. It causes lightheadedness that appears particularly in elderly people with change of position, usually from lying or sitting to standing. *Id.*

[12]Ablation is removal of a body part or the destruction of its function, as by a surgical procedure, morbid process, or noxious substance. STEDMANS 890. Electrode catheter ablation is a method of ablating the site of origin of arrhythmias whereby high-energy electrical current is delivered by intravascular catheters. *Id.*

biopsy, lab work, a QSART (quantitative sudomotor axon reflex test), thermoregulatory sweat test, a tilt test, and a sweat gland biopsy, as well as extensive lab work. *Id.* at 448, 451, 456, 460.

Records show she reported she had chest pains, palpitations, fatigue and exhaustion for the previous year. *Id.* at 451, 453. She also had other autonomic symptoms such as dry eyes and mouth. *Id.* at 453. A thermoregulatory sweat test at that time was indicative of autonomic failure,[13] showing widespread anhidrosis. *Id.* at 453. Her treating neurologist noted that "[t]his pattern could indicate autonomic failure, but might also reflect chronic Ditropan use." *Id.* at 574. Similarly, she had an abnormal QSART, but the result may have been affected by Ditropan use. *Id.* at 455. An autonomic reflex study showed tachycardia with a rise of 33 beats per minute. *Id.* She was diagnosed with chronic fatigue, limited autonomic neuropathy, and orthostatic intolerance. *Id.* at 452.

A repeat autonomic reflexes screen on January 29, 2008, showed:

> Mildly abnormal study. There was evidence of mild cardiovagal impairment with normal cardiovascular and adrenogenic and postganglionic sympathetic sudomotor responses. A limited autonomic neuropathy (cardiovagal) is possible. Compared to the previous study of 7/25/07, pseudo-motor function has improved dramatically likely related to testing the patient this time 48 hours or more off Ditropan XL. It would be of interest to see if thermal regulatory sweating is still impaired or not.

*Id.* at 497. A repeat QSART was essentially normal at all sites. *Id.* Her treating neurologist reported that her "autonomic reflex scan done off Ditropan is almost normal." *Id.* at 500.

---

[13]Pure autonomic failure is "a degenerative, sporadic neurologic disorder of adult onset, manifested principally as orthostatic hypotension and syncope, with no neurologic defects other than autonomic nervous system dysfunction evident; probably caused by selective degeneration of neurons in the sympathetic ganglia, with denervation of smooth muscle vasculature and the adrenal glands." STEDMANS 145050.

He also reported that she had "some reduction of cardiovagal function." *Id.* Ultimately, she was diagnosed with chronic fatigue and orthostatic intolerance. *Id.* She was also seen by an endocrinologist and a nutritionist at that time. *Id.* at 506, 508. Her treating cardiologist also confirmed the chronic fatigue syndrome and orthostatic intolerance diagnoses. *Id.* at 510.

Redwine's history also includes internal urethrotomy, and multiple urethral dilations as a child. *Id.* at 388, 448. Urology records show that Redwine has problems with her bladder and reported that she goes to the bathroom to urinate at least 20 times a day. *Id.* at 387. She was diagnosed as having interstitial cystitis in 2000, after a cytoscopy and hydrodistention. *Id.* at 448. Records show she tried numerous medications, but found some relief with Ditropan. *Id.* at 387, 448. In July 2007, a urologist at Mayo Clinic noted she had held all bladder medications while undergoing autonomic testing, but that "given the persistence and worsening of her symptoms on Ditropan, she should try another medication." *Id.* at 449. The urologist at Mayo Clinic diagnosed "interstitial cuptitis, diagnosed by hydrodistention and bladder ulceration." *Id.*

She was also diagnosed as having probable female urethal syndrome.[14] *Id.* at 386. In March 2007, her treating urologist reported that Redwine continued to complain of "difficulty voiding/emptying and says that this is her #1 bother/concern. Her second most bothersome symptoms is pain with a full bladder. She also has significant urinary frequency with urgency." *Id.* at 387. She was last seen by her treating urologist in

---

[14]Urethral syndrome is "a condition of no certain etiology, characterized by urinary frequency, urgency, dysuria in the absence of specific infection, obstruction, or dysfunction. Suprapubic pain, hesitancy, and back pain may also occur. Usually seen in females." STEDMANS 397030.

September 2008. *Id.* at 576. She reported a "flare-up of her symptoms," daytime frequency of about two hours, and increased urgency symptoms. *Id.* at 577. She underwent a cystourethroscopy. *Id.* at 576. Those records show that she was continued on 15 mg. per day of Ditropan and was also prescribed Flomax and Elmiron. *Id.*

Other medical evidence shows medical "impressions" of dry eyes, dry mouth, mild rosacea, mild livedo reticularis[15], major depression, moderately severe, without psychotic features, and major depression in remission. *Id.* at 269, 310, 274, 291, and 332. Furthermore, Redwine has had "bladder surgery, a cyst removed from her pelvis, tubal ligation, heat surgery x 2, leg vein stripping and bladder distention." *Id.* at 603.

The record contains the deposition testimony of a treating physician, Dr. Peter A. Brady, a board-certified cardiologist with specialist training in cardiac electrophysiology, treatment of heart rhythm disorders. *Id.* at 2479-59. He testified about the plaintiff's mental and physical health conditions in connection with her divorce. *Id.* at 247-59. He treated Redwine at the Mayo Clinic. *Id.* at 251. He testified that he first met Ms. Redwine in 2004 when she presented a history of atrial fibrillation, a very common arrhythmia. *Id.* Dr. Brady performed radiofrequency ablation, which is a quasi-surgical procedure. *Id.* He stated that Redwine did fairly well initially, but she had a recurrence "beyond the usual sort of 5 to 10 percent of people," so he performed a second radiofrequency ablation. *Id.* After the second treatment, he stated she did very well with only occasional symptoms from atrial fibrillation. *Id.*

---

[15]Livedo reticularis persistent purplish network-patterned discoloration of the skin caused by dilation of capillaries and venules due to stasis or changes in underlying blood vessels including hyalinization. STEDMANS 231170.

11

Dr. Brady stated that Redwine had "been doing reasonably well from the purely rhythm standpoint for the last several now years." *Id.* He did not believe that her symptoms were related to medication. *Id.* at 252. Dr. Brady was unsure whether Redwine would need further treatment for her atrial fibrillation since there are "a number of aspects to it [atrial fibrillation] that are not fully understood." *Id.* at 253. Since Redwine has gotten along "to this point without the burden of symptoms from atrial fibrillation that she had before," Dr. Brady stated that he feels she "would be in a category that is likely to do well—or continue to do well," but he could not entirely rule out the possibility of further recurrences. *Id.* at 253. He continues to treat her on an ongoing basis, but not specifically for atrial fibrillation, noting that she continued to have "some symptoms that are probably related to short periods of irregular heart rhythm, and that has been a major symptom complex for her." *Id.* at 254. He stated the condition is "not entirely, let's say, being resolved." *Id.* at 254. He stated that he had examined her in January 2008 and that her diagnoses at that time were: 1) chronic fatigue, 2) orthostatic intolerance, 3) depression, and 4) history of atrial fibrillation. *Id.* at 255.

Dr. Brady referred to her conditions as complicated and overlapping, and testified that both he and Dr. Low, a neurologist, treated her for chronic fatigue and orthostatic intolerance. *Id.* Asked if he had an opinion whether Redwine was disabled, he testified, "I think that certainly the conditions that we're treating her for can be and seem to be sufficient to cause her disabling symptoms, yes." *Id.* at 256. He stated that Redwine mentioned to him that she would have difficulty returning to work as a nurse. *Id.* He further stated that he described symptoms that were consistent with her diagnoses. *Id.* Dr. Brady also stated that he had seen "significant deterioration in Miss Redwine's overall physical

condition" over the previous several years.  *Id.* at 256-57.  He stated that he had "no reason to disbelieve any of those symptoms that she [had] relayed to [him] or, indeed, other physicians."  *Id.* at 256-57.

The record also contains the deposition testimony of Dr. Philip Low, a board-certified neurologist, specializing in the autonomic nervous system, who also testified in May 2008 regarding Redwine's mental and physical health conditions in proceedings involving her divorce.  *Id.* at 292-300.  Dr. Low first met Redwine in 2007 when she was referred to him by Dr. Kreuger, a neurologist, for treatment of autonomic complaints of fatigue and orthostatic intolerance, which means she felt lightheaded on her feet.  *Id.* at 295.  Dr. Low confirmed the diagnosis of chronic fatigue syndrom and orthostatic intolerance.  *Id.* at 295-96.  Dr. Low confirmed these diagnoses with objective tests that showed at first that she did "not sweat at all, and that raised some concerns."  *Id.* at 296.  Dr. Low testified that he repeated the testing when she was off medications and the results of the study improved significantly, "suggesting that some of that was due to medications." *Id.* at 296.  He further testified that there are "other parameters that suggest that she does have orthostatic intolerance."  *Id.* at 297.

He reported that Redwine's major complaint was chronic fatigue and he continued to treat her for it, although "chronic fatigue is the most difficult to treat. It's the syndrome we understand least well and tends to be rather protracted.  The orthostatic intolerance we can manage to a significant degree although that, too, tends to be rather chronic."  *Id.* at 297.  Dr. Low was asked if he had "an opinion based upon a reasonable degree of medical certainty as to whether or not [Redwine] is disabled at this point in time?" *Id.*  Dr. Low responded, "I think she is quite disabled at the present time."  *Id.*  Dr. Low additionally

13

stated that at this time "it would be relatively difficult [to engage in gainful employment] because of the fatigue and orthostatic intolerance." *Id.*

On December 17, 2008, Redwine was seen for follow-up by Betty F. Ball, M.D., a neurologist in Scottsbluff, and was advised to continue with her follow-up visits at Mayo Clinic where her primary specialist there was in charge of readjusting her medications. *Id.* at 597. Redwine reported that her lightheadedness, chest pain, dryness and sweating seem to be related to her amount of food intake, her activity level, and her ability to remain hydrated. *Id.*

A consulting physician, Jerry Reed, M.D., competed a physical residual functional capacity (RFC) analysis, dated February 25, 2008, based on a review of the claimant's medical records. He found she should avoid concentrated exposure to extreme heat and cold and fumes and odors, but had no visual or manipulative limitations. *Id.* at 347-48. She was limited to climbing, balancing, stooping, kneeling, crouching, or crawling only occasionally. *Id.* at 346. As far as exertional limitations, he found she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and found no limitations on pushing or pulling. *Id.* at 345-48.

In an attached narrative, Dr. Reed addressed the extent to which the plaintiff's symptoms were attributable to a medically determinable impairment, whether the severity or duration of her complaints was disproportionate to the medical findings, and whether the alleged effect on function was consistent with the total medical and nonmedical evidence. *Id.* at 349, 352-54. Dr. Reed stated that the plaintiff's primary diagnosis was that of

14

possible autonomic dysfunction "very likely secondary to medications." *Id.* at 352.  He stated, she "is also status postop cardiac ablation x2 with some atrial arrhythmias residual and has weakness, fatigue, and a history of interstitial cystitis syndrome or possible female urethral syndrome." *Id.* at 352.  He noted "there are records talking about her urologic situation . . . though that does not appear to be a current problem at this time." *Id.*

He acknowledged that all of her impairments were interrelated in that "it is her interstitial cystitis and possible urethral syndrome that has prompted her to be on a variety of different medications, mainly those that are either anticholinergenic or muscarinic in nature." *Id.*  He acknowledged that "[f]atigue was still a major symptom and did restrict her somewhat." *Id.*  He noted she "did have some abnormalities noted on her tilt testing, but again because of her previous ablations one would have to consider that her vasovagal mechanisms are somewhat altered because of the prior cardiac ablation." *Id.*  Because he found no treatment records other than the January 2008 Mayo Clinic visit, "one could project her to April 2008 to almost a nonsevere status; however, I think she certainly has some restrictions that are noted in the current EFC, but she is capable of carrying out those functions." *Id.* at 354.  He concluded that "the patient has a number of issues and certainly is aware of good portions of her body and perhaps overreacts to some of her symptomatology; however, she does have some limitations."  His finding was based in part on the fact that "she has been off the Ditropan and appears to be almost normal." *Id.*

On May 30, 2008, Glen Knosp, M.D., a consulting physician, affirmed Dr. Reed's findings as written. *Id.* at 355.  His final diagnoses were mild autonomic dysfunction, S/P cardiac ablation x2, IC cystitis syndrome, and female urethral syndrome. *Id.* at 355.

15

On April 8, 2007, Dr. Lee Branham, Ph.D., a consulting psychologist, completed a Psychiatric Review Technique evaluation. *Id.* at 356-71. He determined that Redwine had a medically determinable impairment, depression without psychotic features, that did not satisfy the diagnostic criteria. *Id.* at 359. He concluded that Redwine's impairment was not severe. *Id.* at 356. With respect to functional limitations, Dr. Branham found that Redwine had only "mild" restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* at 366. In addition, he found the evidence did not establish the presence of the "C" criteria of § 12.04. *Id.* at 367. He noted, "[c]laimant has history of depression without psychotic features and has 50 pound weight loss in past year . . . weight has remained stable in recent months . . . appetite was improving . . . Overall, claimant's depression is under satisfactory control and is improving both by Dr.'s assessment and by claimant's report. Claimant's depression would impose no severe functional limitations at the present time." *Id.* at 368. Consulting psychologist Linda Scmechel, Ph.D., affirmed Dr. Branham's report as written. *Id.* at 371.

### B. ALJ's Findings

The ALJ found that Redwine was not disabled. *Id.* at 11. The ALJ found that she had the "following severe impairments: paroxysmal atrial fibrillation and interstitial cystitis." *Id.* at 13. The ALJ found that depression was not a severe impairment because "at the time of the hearing, Medical Expert Nancy Winfrey, Ph.D., testified that there is no diagnosis of mental impairment in the medical records except in Exhibit 20F [,diagnosing her with dysthymia,] which is from April 2009." *Id.* (alteration in original). Furthermore, the ALJ found, with respect to the claimant's mental health, that Redwine's "depression was

16

under satisfactory control and was improving both by doctor's assessment and by claimant's report." *Id.* He based that finding on the state agency reviewing psychologists' opinions, giving them great weight. *Id.* at 13. He did not discuss the diagnoses, opinion, or records of Redwine's treating psychiatrist and mental health practitioners, despite the fact that she had been diagnosed with major depression in August 2007, was undergoing therapy at the time of the hearing, and was being treated for dysthmia. *See id.* at 604. No treating mental health practitioners submitted Psychiatric Review Technique evaluations.

The ALJ next found that Redwine's impairment or combination of impairments do not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926 ("the Listings"). *Id.* at 13. He found that no treating or examining physician "has mentioned findings equivalent in severity to the criteria of any listed impairment" and noted that "[t]he claimant's attorney has never asserted that the claimant meets or equals any listing." *Id.*

He then determined that Redwine had the residual functional capacity to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the ability to lift and/or carry twenty pounds occasionally and ten pounds frequently; to walk and/or stand four hours in an eight hour workday but no more than thirty to forty-five minutes at one time; to push and/or pull to lifting limitations; to climb stairs occasionally but never ladders or scaffolds; to balance, stoop, kneel, and crawl occasionally; and with no exposure to extreme heat, extreme cold, humidity, and hazards of the workplace.

*Id.* at 14. The ALJ stated that the claimant's testimony showed that she had actually improved in her physical activities since her last hearing in May 2007.[16] *Id.* at 19. The ALJ stated that in determining Redwine's RFC, he had considered all of her symptoms and "the

---

[16]There is no transcript or record of the earlier hearing or decision in the administrative record.

extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* In addition, he gave "some" weight to the opinions of Redwine's treating physicians, but afforded "great weight to the opinions of the State Agency Reviewing Physicians." *Id.* at 18-19.

The ALJ found Redwine unable to perform any of her past relevant work. *Id.* at 19. However, he found that Redwine, who was defined as a "younger individual"—age 18 to 49—on the alleged disability onset date, had "acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." *Id.* The ALJ based his decision that Redwine has transferable work skills on the vocational expert's testimony. *Id.*

## II. LAW

In an appeal of the denial of Social Security disability benefits, this court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011) *(quoting Dolph v. Barnhart*, 308 F.3d 876, 877 (8th Cir. 2002). Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Id.* (*quoting Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010)). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

Nevertheless, the court's review "is more than a search of the record for evidence supporting the [Commissioner's] findings," *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001) (internal quotations and citations omitted), and "requires a scrutinizing analysis, not

18

merely a 'rubber stamp' of the [Commissioner's] action." *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990). The court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). The court owes no deference to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. . . ." 20 C.F.R. § 404.1505. To determine whether a claimant is disabled, the Commissioner must perform the five-step sequential analysis described in the Social Security Regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the Commissioner must determine: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to [his] past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 678 n.9 (8th Cir. 2009). "Through step four of this analysis, the claimant has the burden of showing that [he] is disabled." *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). Once the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." *Id.*

19

The determination of a claimant's RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. *See* Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *1 (July 2, 1996) (Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims). RFC is not based solely on "medical" evidence; rather, the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of the limitations. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity.[17] *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir.2003) (quoting *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir.1997)).

"[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000)

---

[17]Limitations may be exertional, nonexertional or a combination of both. 20 C.F.R. § 404.1569a(a). Exertional limitations are those that only affect a claimant's ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing and pulling). 20 C.F.R. § 404.1569a(b). Non-exertional limitations are those that affect a claimant's ability to meet job demands other than strength demands. 20 C.F.R. § 404.1569a(c). Examples of nonexertional limitations include: difficulties functioning because of nervousness, anxiety or depression; difficulties in maintaining attention or concentration; difficulties in understanding or remembering detailed instructions; difficulties seeing or hearing; difficulties handling physical features of a work setting, such as dust or fumes; or, difficulties with manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling, or crouching. *Id.*

(quoting 20 C.F.R. § 404.1527(d)(2) (2006)).  The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d at 961.  The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.  *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ cannot substitute his opinion for the medical opinions. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).  Further,  the opinion of a specialist about medical issues related to his or her specialty is generally afforded more weight than the opinion of a medical source who is not a specialist.  *See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994); 20 C.F.R. § 416.927(d)(5).

A vocational expert's testimony constitutes substantial evidence only when it is based on a hypothetical that accounts for all of the claimant's proven impairments. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010).  "The hypothetical 'need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments.'" *Id.* (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (internal quotation omitted)).  A vocational expert must take a claimant's medical limitations into account and offer an opinion on the ultimate question whether a claimant is capable of gainful employment.  *See Kelley,* 133 F.3d at 589.

The ALJ may not discount subjective complaints of pain solely because they are not fully supported by objective medical evidence. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).  When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency,

and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.  *See Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984).  When an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factor.  *Kelley v. Callahan,* 133 F.3d 583, 588 (8th Cir. 1998).

Social Security Rulings do not have the force and effect of law, but are "binding on all components of the Social Security Administration" and represent "precedent final opinions and orders and statements of policy and interpretations" adopted by the Commissioner.  20 C.F.R. § 402.35(b)(1).  In a policy interpretation ruling, the Social Security Administration has provided guidance on the evaluation of claims involving interstitial cystitis (IC), explaining that "IC (a complex, chronic bladder disorder), when accompanied by appropriate symptoms, signs, and laboratory findings, is a medically determinable impairment that can be the basis for a finding of 'disability.'" Soc. Sec. Rul. 02-2p, 2002 WL 32063799, at * 1 (November 05, 2002) (Policy Interpretation Ruling Titles II and XVI: Evaluation of Interstitial Cystitis).  "The standard test currently used to aid in the diagnosis of IC is a cystoscopy with hydrodistention of the bladder (performed under anesthesia)."  *Id.* at *2.  The ruling further provides:

> IC can cause limitation of function.  The functions likely to be limited depend on many factors, including urinary frequency and pain.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It also may affect ability to do postural functions, such as climbing, balancing, stooping, and crouching.  The ability to tolerate extreme heat, humidity, or hazards also may be affected.

> The effects of IC may not be obvious.  For example, many people with IC have chronic pelvic pain, which can affect the ability to focus and sustain attention on the task at hand.  Nocturia (nighttime urinary frequency) may disrupt sleeping patterns.  This can lead to drowsiness and lack of mental clarity during the day.  IC also may affect an individual's social functioning.  The presence of urinary frequency alone can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night.  Consequently, some individuals with IC essentially may confine themselves to their homes.  In assessing RFC, we must consider all of the individual's symptoms in deciding how such symptoms may affect functional capacities.

*Id.* at *5.

Similarly, the Social Security Administration offers guidance with respect to evaluation of Chronic Fatigue Syndrome claims.  Soc. Sec. Rul. 99-2p, 1999 WL 271569, at *1 (April 30, 1999) (Policy Interpretation Titles II and XVI: Evaluating Cases Involving Chronic Fatigue Syndrome (CFS)).  CFS is "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity . . . characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities."  *Id.* at *1.  The "hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong) [and] cannot be explained by another physical or mental disorder."  *Id.* at *1.  Moreover, CFS is not the result of ongoing exertion and is not substantially alleviated by rest.  *Id.*  Symptoms of CFS include "[s]ore throat; [t]ender cervical or axillary lymph nodes; [m]uscle pain; [m]ulti-joint pain without joint swelling or redness; [h]eadaches of a new type, pattern, or severity; [u]nrefreshing sleep; and [p]ostexertional malaise lasting more than 24 hours."  *Id.* at *2.  A person with CFS might also exhibit "muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity),

orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety)." *Id.* Recognized examples of medical signs, clinically documented over a period of at least six consecutive months, that will establish the existence of a medically determinable impairment in a CFS case include "[p]alpably swollen or tender lymph nodes on physical examination; [n]onexudative pharyngitis; [p]ersistent, reproducible muscle tenderness on repeated examinations . . . ; or, [a]ny other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record." *Id.* at *3. Further, CFS may be established by: (1) laboratory findings including neurally mediated hypotension or an abnormal exercise stress test; and (2) mental findings, including problems with short-term memory, information processing, visual-spatial issues, comprehension, concentration, speech, word-finding, calculation, and anxiety or depression. *Id.* Courts recognize that there are no specific laboratory findings that are widely accepted as indicative of CFS and no test for CFS. *See*, e.g., *Vega v. Commissioner of Soc. Sec.*, 265 F.3d 1214, 1219-20 (11th Cir. 2001) (holding that the ALJ failed to analyze the effect of CFS on a claimant's ability to do work meaningfully when he rejected CFS as a diagnosis for want of a definite test or specific laboratory findings to support the diagnosis).

### III.  DISCUSSION

On review of the record as a whole, the court finds there is not substantial evidence in the record to support the ALJ's decision that Redwine is not disabled. The ALJ erred in several important respects.

First, the ALJ failed to find that the plaintiff's Chronic Fatigue Syndrome was a severe impairment.  The ALJ did not properly consider the diagnosis of CFS or evaluate the effect the CFS symptoms had on Redwine's ability to work in determining her RFC. Two treating physicians have diagnosed CFS.  The diagnosis of Chronic Fatigue Syndrome is supported by objective medical evidence, clinically documented over a period of six months, that the Social Security Administration recognizes establish a medically determinable impairment of CFS.   Redwine's clinical complaints include sleep disturbances, post-exertional malaise, vision difficulties, orthostatic intolerance, neurocognitive problems, and depression, all of which are signs indicative of a CFS diagnosis. Dr. Low's testimony clearly indicates that Redwine exhibits symptoms that meet the criteria for the disease.  Objective evidence shows she has some degree of neurally mediated hypotension, orthostatic intolerance, and limited autonomic failure.

Next, although he recognized that interstitial cystitis was a severe impairment, he failed to discuss the nonexertional limitations resulting from that impairment.  Pain and urinary frequency are such nonexertional limitations.   Ms. Redwine's need to use the restroom every few hours is thoroughly documented in the medical records.  Neither the ALJ nor the vocational expert discussed this aspect of Ms. Redwine's disability.  The ALJ did not follow Social Security policy interpretation rulings in connection with evaluation of the functional effects of interstitial cystitis as a medically determinable impairment.

Also, the ALJ committed error when he afforded more weight to the opinions of the consulting physicians than to the professional opinions, supported by objective medical evidence, of Redwine's treating physicians.  The record shows that two treating physicians, both of whom were specialists, stated that Redwine's impairments would reasonably result

in the symptoms she exhibited, and that those symptoms would preclude employment.  Dr. Brady testified that her atrial fibrillation was not completely resolved and Dr. Lowe testified that she continued to be disabled by CFS.  Contrary to the ALJ's assertion, Dr. Brady's opinion, read in context, was not limited to nursing jobs.

The RFC assessments by Drs. Reed and Knosp were based only on review of medical records.  Neither physician examined the plaintiff.  The testimony of a consulting physician who has never examined the claimant is not substantial evidence on which to place a disability determination, especially in the face of objectively supported opinions by treating physicians.   Further, Dr. Reed's conclusions were premised on incorrect assumptions.   The finding that medication was the likely cause of Ms. Redwine's orthostatic intolerance is not supported by the record.  The results of follow-up testing, when Ms. Redwine had been off Ditropan, still showed symptoms consistent with limited autonomic functioning.  Although her results had improved since the earlier testing, the test still reported "mildly abnormal" results.  Moreover, the repeat tilt test, as well as other parameters, confirmed some lightheadedness, indicative of orthostatic intolerance.  Importantly, those clinical findings support a diagnosis of chronic fatigue syndrome.

Dr. Reed's RFC determination was based on the incorrect assumption that Redwine was no longer taking Ditropan.  Urology records that postdated Dr. Reed's report show that she continues to take 15 mg. of Ditropan per day.  Accordingly, Dr. Reed's finding that "when [Redwine] is not on Ditropan she does not have symptoms," is meaningless.  Dr. Low's and Dr. Brady's opinions that is Redwine is disabled as a result of her Chronic Fatigue Syndrome are fully supported by the evidence.  Even if the consulting physician's opinion were afforded weight, Dr. Reed's narrative is highly equivocal and qualified by

26

statements acknowledging Redwine's nonexertional limitations.  Although Dr. Reed acknowledged that Redwine's impairments were interrelated, he, and consequently the ALJ, failed to consider those impairments in combination.

Further, the ALJ erred in discounting Redwine's complaints of chest pain, bladder pain, chest pain, lightheadedness, back pain, urinary frequency, and crippling fatigue. Objective evidence shows that Redwine continues to suffer residual effects of her cardiac procedures, intermittent atrial fibrillation, interstitial cystitis, and CFS.  Although the ALJ recited boilerplate standards on evaluation of pain and other limitations, he failed to apply those standards in a meaningful way.  He stated that the plaintiff's testimony was not credible, but failed to explain why, except to say that it is inconsistent with the residual functional capacity assessment.  That rationale is circular at best.  Moreover, there is no support for the ALJ's blanket assertion that the objective evidence does not corroborate the claimant's allegations of disabling pain, fatigue, and weakness.  Noting that Redwine's exertion levels and activities had increased since the prior hearing, the ALJ failed to discuss Redwine's nonexertional limitations or to address the record evidence showing that any improvement in that regard may have been based on Redwine's observance of a strict diet and sleeping regimen and was highly dependent on her ability to lie down and nap during the day, which is incompatible with full-time employment.  Credible evidence in the record shows that only by observing a strict diet and medication regimen, maintaining adequate liquid intake, and obtaining ample sleep, is the plaintiff able to function at all.

Contrary to the ALJ's conclusory finding that Redwine's daily activities do not support a finding of disability, the court finds that Redwine's daily activities are not incompatible with disabling pain and fatigue.  Simply being able to care for one's basic

needs does not equate to an ability to work in a day-to-day working environment.  She consistently reported the same symptoms to numerous doctors, made repeated visits to physicians, and underwent numerous procedures in an effort to treat those symptoms. Medical records show repeated visits to primary care doctors and specialists with long-standing complaints of pain, fatigue, and bladder problems.  She traveled to Mayo Clinic for treatment.  Redwine has undergone two serious cardiac procedures and has undergone numerous tests that validate her complaints.  Those doctor-visits and procedures lend credence to her complaints.  Further, her nonexertional limitations are supported by objective evidence the record.

Furthermore, the ALJ compounded these errors in questions posed to the vocational expert.  The ALJ did not pose a hypothetical to the vocational expert that included all of Ms. Redwine's medically supported and credible limitations, nor did it capture the concrete consequences of her disabilities.  Because the hypothetical did not include all of the plaintiff's impairments, the vocational expert's opinion that there are jobs in the national economy that a worker with her impairments could perform cannot constitute substantial evidence in support of the ALJ's decision.  Absent reliance on a vocational expert's testimony, the Commissioner has failed to sustain the burden to show there are other jobs in the national economy that Redwine can perform.  In fact, the vocational expert testified that if a worker would need frequent breaks and would be likely to miss more than two days a month due to health conditions, that worker would not be employable.  Nothing in the record supports the conclusion that Redwine could perform either skilled or unskilled work in the national or regional economy.

Moreover, the ALJ did not consider the combined effects of Redwine's acknowledged severe impairments.  The record is replete with medical evidence that shows that Redwine suffers chest and bladder pain, chronic fatigue, orthostatic hypotension, autonomic dysfunction, interstitial cystitis, heart problems, and depression. Her treating physicians have stated that Redwine's health problems are complex, chronic, tend to reoccur, and difficult to treat.  It further appears that the ALJ erred in considering Redwine's mental impairments, but, in light of the court's disposition, it need not address that issue.

The court sees no reason to further prolong this case.  Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability.  *Pate-Fires v. Astrue*, 564 F.3d at 947; *see also Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").  Here, the clear weight of the evidence fully supports a determination that Redwine was disabled within the meaning of the Social Security Act as of August 30, 2007, and is entitled to benefits as of that date.

Accordingly, the decision of the ALJ is reversed and this action is remanded to the Commissioner for an award of benefits.

IT IS ORDERED:

1.   The decision of the ALJ is reversed.

2.   This action is remanded to the Commissioner for an award of benefits.

3.   A final judgment will be entered in accordance with this Memorandum and Order.

DATED this 26th day of March, 2012.

BY THE COURT:


s/ Joseph F. Bataillon
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.